. This is now open. The honorable justice Joseph E. Burkett presiding along with justice Susan Hutchinson and justice Mary Shostek. People of the state of Illinois plaintiff versus Darren A. Good morning. We want to thank both parties for agreeing to this oral argument this morning remotely. Before we begin, let me make a few comments about our format. Just as if we were in the Elgin courthouse, you'll be given your allotted time of 15 minutes. When you're not arguing, as our clerk Jeff Kaplan pointed out, please mute your phone. Each party will have 15 minutes for your main argument. The appellant will have five minutes for rebuttal. As you heard, the clerk of the court Jeff Kaplan will operate a signal when there are five minutes remaining in your argument. As is our practice in the second district, we've all read the briefs and we're familiar with the facts of the case. You need not repeat the facts of the case. What will be different today is that we will not be interrupting your arguments with questions as we usually do. Conducting oral arguments remotely makes it awkward to proceed in that manner. So we will save time for questions until you complete your argument. Keep in mind you are not required to use all of your time. Certainly if you complete your argument, your main argument before the signal, invite us to ask questions at that time. Remind you that no one except the clerk of the court is permitted to record this argument. Do either of you have any questions regarding the format today? On behalf of the defendant, I do not. Mr. Taylor, any questions? No, Your Honor, no questions. Very well. We may proceed, Mr. Heller. Thank you, Your Honor. May it please the court, in preparing for this argument, it occurred to me that in my 42 years of practice, I have never had occasion to address this court while sitting down, while wearing blue jeans, or while not being able to see the court. And seeing is an important part of perception. And that is something that the defense can't do. It's something that you can't do from the written record that you have before it. And this is a case where perception is probably more important than most, simply because Mr. Jacobs wasn't convicted based upon what he did, but what he looked like and what his wife looked like. The evidence was extremely close. It was contentious. And the defendant was not allowed to present his theory of the case. The long and short of it is we had a young girl who really didn't see her mother very much. She spent most of the time with Mr. and Mrs. Jacobs. Mrs. Jacobs was not an attractive lady, and physically she was not appealing to the jury at all. Mr. Jacobs, who had spent most of his adult life volunteering and helping people, did not dress in fancy clothes. He talked a little bit funny, and he looked a little bit different. And those were the strikes that were against him. This young girl came in in a situation where her mother was basically entering into an important time of her life when she was getting remarried. And yet at every turn in these important events, she shut her daughter out of her life and pushed her away and on to the Jacobs. And when she was planning for these events and her daughter was upset, she reached out for attention. And the defendant's expert was prepared to testify about the fact that this is attention seeking behavior. He had substantial educational background and was licensed by the state of Illinois as a psychiatrist or psychologist. And to suggest that he had to be on the sex panel in order to make his testimony relevant is just not consistent with the case. The cases, and a lot of them come from expert witness testimony cases in the civil side, but the cases seem to say that the licensure is the key to determining whether or not the defendant is a psychiatrist or psychologist. He certainly was licensed. The trial court's finding that he didn't have any educational background or experience beyond that of the average jurors, just absolutely without fact or foundation. In the voir dire, most of the jurors were questioned about whether they had any psychological training, and they said no. Clearly his ability to talk about what attention-seeking behavior was and what the things to look for, such as the fidgetiness with the young girl exhibited on the tape, the fact that she was changing her stories, the inconsistencies, are simply matters of child psychology, of psychology in general, and are covered by the license. If any of us could simply be experts and have the same expertise as licensed professionals, then why would the state require a license to be such a professional? And why would we accept the arguments of lawyers who have an incentive to tell the jury what attention-seeking behavior is or isn't, or what the children always do? The prosecutor used that term numerous times. That's what children do. Children are like many things. You can have anecdotal stories, but that doesn't predict generally what children will do. You need studies. You need to read the research, and there isn't anything in the record that indicates that the prosecutor had any of that experience. It would have aided the jury to understand why this little girl would testify the way she did, why she needed attention, because her mother was shutting her out of her life. And when she shut her out of her life, she sent her to the Jacobs. So the little girl needed to get away from the Jacobs not because of anything they'd done. As a matter of fact, over and over she said that Darren had always been good to her, that she called him Daddy, that she sat in his lap, and that even on the day that this allegedly happened, she wasn't unhappy with him, even when he had taken her home. It wasn't until much later that this story emerged after prompting from Mom and from Grandma. In fact, when she told Grandma that, or the friend rather that called Grandma, that Darren had touched her and she didn't like it, there was this outrage and this sense that they were going to dig to the bottom of it. And we find out that Darren had tickled her and that she didn't like it. And so Mom told Darren to not tickle her anymore. And yet that grew into this story, this complaint, and the prosecution. We would like to think that when we put people in jail for extended periods of time, we do so because we're convinced beyond a reasonable doubt that they committed the crime. But where the complaining witness is just absolutely not credible, and the prosecutor engages in misconduct designed to paint the defendant with a picture that is not supported by the facts, those convictions are not beyond a reasonable doubt. Quite frankly, this young girl was interviewed in a situation where the interviewer told her when we're in here, we only talk about the truth, only tell us things that really happened, and she told us about things like Darren floating in a chair, like Michelle catching him with a fishing rod.  interviewer told her that if that testimony had come out in the context of a will contest, there would have been no hesitancy whatsoever for the court to rule that that witness wasn't even competent to make a will, let alone put an individual in jail. The long and the short of it was that there was this desire to have the prosecutor engage in what I'll call a meeker type of statement. He said to the wife, basically, you did, you kept a diary because you knew your husband was somebody you had to be protected from. Well, there was absolutely no evidence to back that up, none whatsoever. The witness denied it, and yet the court allowed this case to go to the jury even with that mistake, saying that in meeker the prosecutor had only misconducted, had misconducted four times, asked four misconduct questions. Well, no case that I found says that the prosecutor gets a free shot. Not that the prosecutor gets to engage in one dirty trick and that if you get caught with that dirty trick, then you can, it's okay, you can get away with it because it's only once. Is two enough? Does meeker stand for the proposition that you get three chances to paint with the tainted brush? In a civil case, if I were to mention insurance only once, I suspect that the court would grant a mistrial, but that's what happened, and given the nature of the testimony in this, it can't be deemed to be an   You basically had a prosecutor who had been convicted of misconduct. You had a prosecutor who had  You had a prosecutor who was saying, come on, ladies and gentlemen, you know, look at this lady, she needs to keep track of her husband because she knows he'll do evil things, and yet there was absolutely nothing in the record to support that. There was no indication that Mr.  life other than serve the people of his community as an emergency responder and a And the mother, who obviously had financial benefits in mind, which the jury also didn't get to hear about, how she was going to take this family for all they were worth. The jury didn't get to hear any of that. So we're asking, your honors,  result of all of these matters  court rule that as a result of all of these matters and as the accused, that the court rule that as a result of all of these matters, that this verdict be set aside at a minimum and that at a minimum, Aaron be granted a new trial or in the alternative, simply reverse the conviction. With that, I would take any questions the panel might have. Mr. Heller. Justice Hutchinson, your questions. Thank you, Justice Burkett. Mr. Heller, you started by saying that you felt that the trial was critical to the  You said, we can't see us, we can't see you, but that is critical to this particular case about how Mr. and Mrs. Jacobs look. Where is that coming from in the record? How are you coming to that conclusion? Well, I'm coming to that conclusion because of the fact that, I mean, everyone who participated in the trial saw Mrs. Jacobs. She is a very, very large woman. And she had, I don't want to say a slovenly appearance, but she did not present well in terms of sitting on the stand. And then when the prosecutor was haranguing with her and   And I think that that is important. And I think that that is important. And I think that her physical presence and Mr. Jacobs' physical presence played a role in this case and that had it been someone else sitting at the defense table, someone that looked differently, someone that spoke without a lisp, that the   I know they should have been different. So this appears to me to be something that is not So my opinion is based upon your observations. No one has reported that to you. Is that correct? That is correct. Okay. Dr. Campion certainly is a clinical psychologist. He is licensed in the state of Illinois. But what experience, if any, has he had dealing with children? Well, he's had a lot of experience dealing with children. And he does fitness for duty exams involving children, issues for multiple police departments and for municipalities and other governmental entities, which would include knowing how to interpret what reactions there are with children and situations where adults interact with children. A portion, not a large portion, but a portion of his practice would have covered that. And certainly that's a part of the practice that is permitted under the licensure of the state of Illinois. He certainly would not be restricted from seeing or providing counseling to children if they came to see him. Well, that may be all well and good. But what, if any, experience did he testify to where he has interviewed children and has had to make, you know, render professional opinions about the conduct of children, not the adult, but of the children? I don't have that right in front of me. I do recall that he testified that a portion of his practice did include dealing with children, but it was a small percentage. I admit that. But that, again, only goes to the weight to be given to his testimony, not its admissibility. Well, he used the word that the child showed maladaptive behavior. First of all, did he explain what that meant? I believe it meant that she was fidgety and unable to maintain her precise posture or position, that she talked faster when she was not telling the truth or making up stories. I believe that maladaptive behavior is a term of art, and he was using that in the manner in which it's defined in the DS3M, or I may have those abbreviations. You just said, I believe and I understand it to be, what did Dr. Campion in that motion in limine describe it as? He did not define, I don't believe he was asked to define maladaptive behavior. He used the term, I believe that from a standpoint of psychologists, that's what it means. I think that is the accepted definition of that term on a medical basis. We could look in a medical dictionary and find that, but I believe that is a standard medical term that is used within the industry. Did he also, did he testify or indicate at that motion in limine that the child talked faster when she was not telling the truth? Yes. Did he say, kill them? No. He said that he had watched the tape, that was an issue which came up, and that you could tell from her that the way she moved at certain times that she was uncomfortable with what she was saying and that it was a sign of attention seeking behavior. Had he ever seen this child before? No, he never saw the child. He wasn't allowed to see the child. So he did not actually interview her or put her through any tests either, is that correct? That's correct. The mother would not consent to that. Okay. So he is watching a single tape or did he see both tapes? He saw both tapes. Okay. Now, isn't it true, Mr. Heller, that when the child was talking about the fishing pole and the candy and the floating in air, she was referring to pictures she had drawn? Yes. And the interviewer actually said, well, we're only supposed to talk about things that did happen, and she said these did happen. She said these were actual incidents that she was drawing pictures of. Incidents of what? Of Darren floating in the chair, of Michelle catching him on a hook, using candy for a bait, all of those things. And, of course, we didn't get a chance to really look at all the pictures because the book that she drew in, as the state had at the time of the interview, mysteriously disappeared. And, I mean, did the, did Ms. Mueller say I think her name was Tracy Mueller. Did she say that in her interview that these related to this incident that we're here to talk about the sexual abuse? Or were these incidents or was this something the child did just drawing these during the course of the interview? As I understand it, based on the testimony, and the testimony was from the mother and from Tracy Mueller, that this was a book that the child prepared and brought to the interview to talk about Darren and she used it to show Tracy Mueller the things that she and the defendant had done and what her relationship with the defendant was. And when Tracy said, now, these are just fantasies, aren't they? We only want to talk about things that really happened. She just came right out and said these things did happen. And she said that on more than one occasion, both on the tape and in the trial. This is a little girl who thinks that, you know, has, that fantasy is the same as truth. But I guess my question relates to did she say these things happened with respect to the criminal conduct that he was charged with? Or just these things, this is how they played during the time that she was either with them or being cared for by Mrs. Jacobs? I think the latter. Okay. So they don't necessarily relate to this offense that's charged? No, they don't. I'm not suggesting that Mr. Jacobs was on a fishing hook at the time this allegedly occurred, but it goes to the issue of whether she understands the truth and appreciates the need to always be truthful when asked to do so. And how old is she at this particular time of the testimony? At the time of the testimony, she's five. At the time of the alleged incident, she was a little over three, I think. All right. Now, in terms of the prosecutorial misconduct that you allege, during the course of the argument, did you or I believe you had a co-counsel with you as well? Mr. Mitchell. Did either one of you object to the statements made by the state's attorney? Absolutely. When there was an objection, then I asked the court to take the jury out. I made a motion for a mistrial. I cited the Meeker case. I recall the colloquial, well, the state said something to the effect, Mr. Heller keeps citing all these cases, but he never gives us a cite. I said, well, Your Honor, I assume counsel would say that, so here's the cite. She said, I need to go look at that case. The judge says, I do, too. We took a recess for about a half hour. The judge came back. Counsel came back. Argument went on, and the judge basically said, well, Meeker, they made four misstatements, and in this case, counsel only made one, so your motion is denied. We'll go on. So you were objecting to a single statement at that time. Is that correct? At that time. Okay. Did you object on the other three occasions? Well, there was only one in this case. The whole point is that the court ruled that you can get one free bite. Well, I thought you said that she said several times that's what children do. Yes, she did do that, and in final argument, there was an issue that arose as well, but I think, and I could be wrong, but I suspect if you look at the transcript, there aren't four objections that defendant made that were ever sustained, and at some point, you have to decide whether or not objecting and being overruled isn't worse than not objecting at all, and I don't think. Except it's not necessarily the result of the objection. It is the objection that is relevant to preserving the issue. So you objected one time, and the other however many did not have objections. Is that correct? That is correct. In your motion for a new trial, did you only relate to one? No, in the objection for new trial. We related to all in the motion for new trial. Okay. So do you believe that you properly preserved those issues for our review? I do. Did you ever argue a plain error argument for because there may be some issue that they weren't properly preserved? I did, both in the trial court and the post-trial motion and in my brief. Well, you used the word plain error I saw once, but did you actually go through the analysis of plain error? What it is and how it's found and what the circumstances are? I want to find the page number. We have other questions as well. I think on page 19 of my brief, we do address that and we cite cases for what that standard is and why it was breached in this case. All right. Justice Burkett, I will yield the floor so other questions can be asked. Thank you. Thank you, Justice Shostak. Sir, during or after the hearing on 115.10, did you ever ask the court to rule on the child's competency or were you asking the court just to rule on the admission of the statement? We did, in fact, have a motion to bar the testimony of the child based upon competency which was heard before trial started and denied. It was? It was a hearing? Okay. And I also raised the objection immediately before trial in the trial court and the judge basically said we've been through that, overruled. You see, because I'm kind of noticing in your brief that you somehow conflate 115.10 with 115.14. So the 115.10 is the admission of the statement based upon what the child, you know, and the court ruled based upon time, content, and circumstances that they provide sufficient safeguards of reliability. I've never seen anywhere where you're asking, like I said in your brief, you're conflating the two. Aren't the factors different for weighing 115 admission versus that of competence to testify? Well, in paragraph two of the issues presented for review, we list them together and we argue them together because it's our view that the issue of under 115.10 is the threshold competency of the statement anyway. So I do think they're related and I do think we've raised them separately but together. You've raised them together. You kind of conflate them together. Well, I think they go hand in hand. I think if the child isn't competent in the first instance, you can't have a reliable 115.10 statement from an incompetent witness. Okay. Did you ever raise that? Well, I see what you're saying, you're raising them together. The 146, well, I'm not going to ask you that. People versus Harris is a case that postdates the 115.14 that you cite here, which basically uses the same factors in 115.14, which is different than the factors in 115.10. That is that the witness is capable of expressing themselves in a manner which he could be understood and could imply or express that they want to tell the truth. That's the difference between 115.10 and 115.14. So I'm just having a hard time with your brief and the way you address the competency hearing because I don't think that you address competency as much as you address, I think you conflate them. She answered appropriately during the hearing, didn't she? I mean, during the hearing she answered the question. No, during the 115.10 hearing, she answered the question. She knew how to disagree with you if she disagreed with you, right? I mean, she knew that she had to tell the truth, even though she said something else about the truth and she may not have known what would happen to you if you didn't tell the truth. She said she knew how to tell the truth, correct? Is that the threshold? If the witness comes in and says, yep, I'll tell the truth and then absolutely doesn't know the difference between truth and reality, a deluded person could easily say, I'll tell the truth. I'm talking about confidence to testify and whether or not, well, you're really not. Anyway, how is it that the deluded person is not relevant to her competency to testify? Well, because at the hearing and at trial, she was asked to talk about only things that really happened and they demonstrate that she didn't know the difference between fantasy and the truth. I mean, she didn't know. I mean, she knew she was supposed to tell the truth and she told you the truth and that was that Darren was floating in a chair. Now, you said that at trial, she was three. At trial, she was in fact five. At the time of these incidents, she was in fact five. At trial, she was seven, wasn't she? I could be. That could be. I know she was young. If that's the case, that's okay. I mean, that's not a fact that's disputed. 115.10, though, you don't dispute that 115.10 is not competence. 115.10 is the circumstances of the statement that they provide the safeguards of reliability. Right. And one of the safeguards of reliability is that you have to understand and be able to relate to truth.  statement from someone who was deluded or who didn't know the difference between fantasy and the truth? I mean, one of the exceptions to the hearsay rule is other indicia of reliability. And certainly if you had a deluded person, that would be an indicia of non-reliability. And the circumstances of the statement are she was all over the board about stuff that couldn't possibly be true.  competency, do they look at the totality of the circumstances or do they look at the evidence surrounding the statement? I think they have to. And if a witness says, okay, I know the truth and I am telling the truth, and then it's determined that they don't know what the truth really is, then, in fact, the witness wasn't competent and that testimony should be stricken. You also have argued that there was insufficient evidence, which again, I think you kind of meld all together. But in your brief, I found no citations or no authority regarding this section. Do you believe it's unusual for a 7-year-old to recall every single detail from two years previous? Actually, I think it depends on the 7-year-old. I have three boys. Okay. But that's not part of the record here, so we're not going to talk about that. You made arguments in your statement of fact about her failing to recall every detail. Under 341HA and the Supreme Court rules, you're not supposed to make argument in your statement of fact. Is that correct? We could have stricken your statement of fact and disregarded those arguments. Do you understand? I mean, you said earlier you've been practicing in front of us for a long time. I would think you would know that in the statement of fact you don't include arguments. I think it's page 21. Page 21 is clearly a part of the argument. Maybe that's not right. Maybe I'm wrong on which page it is. Just be careful in the future, sir, including argument in your statement of fact. I will do that. All right. Any more questions, Justice Shostak? One question on the exclusion of Champion's testimony. How is it that his testimony would aid the jurors in their determination? Weren't the statements that you made about him something that already ten of the average juror had no qualifications to testify and why couldn't the jurors glean that from hearing that testimony? You argued it on closing. They didn't have any... It's certainly one thing to have a defense lawyer say something as opposed to have a licensed clinical psychology telling them that's in fact the case. Licensed clinical psychologists have to be qualified to make that statement and that statement has to aid the jurors. That's my question. Just because he's a psychologist, how does that aid the jurors on something they don't already know? None of them had any psychological training. None of them had any inkling how to gauge what that conduct meant. This is not something that we're born with. We might, again, have anecdotal experiences, but since kids are different, what I see in my children might be totally different than what you see in yours. To have a when a child is faced with a problem, look at this little girl wiggling around and being defensive in these answers. There are things going on in her life that he would know about, such as the adoption or the wedding and the mom not taking time. You brought those out, didn't you? Yeah, sure. Is that the same as having a psychologist say this is the facts? Am I saying it's just another example that the prosecutor is saying that I saw the zebra? You can't just take expert testimony and pat it or make it more... You can't take regular testimony and make it more credible by bringing it out of the mouth of a professional, can you? You require it all the time in medical malpractice cases or in legal malpractice cases or in engineering cases. You require an expert to come in and testify as to certain facts. They sure don't have the everyday experience with something like that. They don't have a medical degree. They don't have... If you're saying, I'm not going to go into it. That's fine. Thank you. No further questions. Okay. Thank you. I just have a few questions, Mr. Heller. With respect to Dr. Campion, he summarized what his testimony would be when he, at page 317 of the record, he said, my conclusion is the emotional stability of Mr. Jacobs and my observations of the videos and the impressions, which I hope were very clear from the very beginning. His testimony, as you mentioned, would have gone to the credibility for his ability to determine when C.W. was telling the truth and when she wasn't telling the truth. How is that not in violation of what the Illinois Supreme Court said in People v. Becker, that it's improper to allow a witness to comment directly on the credibility of another witness, which is what his proposed testimony was? If you read the 11510 hearing where Dr. Campion testified, he didn't come right out and say, here's when she's not telling the truth. What he said was, here's the things that you can look at, and then he would have left it to the jury to apply the standards which he would have testified to, the psychological condition, what was going on, to let them make that determination. He would not have said she was lying here. I've read the record. We're going way too long with these questions. You can shorten your answers, but I've read the record. You wanted to get through the back door what you could not get in through the front door under Becker. Basically, you're saying that he would have given the jury the tools to determine for themselves when she was or was not telling the truth. Is that essentially what you're saying? Yes, sir. Both Michelle and the defendant were impeached, correct? Yes. When a jury is looking at whether or not the defendant is guilty, they look at all the evidence, not just what the state presented, right? Well, they're supposed to. Correct. With respect to the brief, as Justice Shostak pointed out, in your reply brief, you really don't address People v. Becker. Do you? Well, I have it in front of me. If I didn't, I apologize for that. That case seems to be directly on point. It's on page 4 of my reply brief. No, I'm sorry. I'm looking at the state's brief. Right. You didn't address it. I don't see it. Okay. Well, I apologize. We have an obligation to follow Supreme Court rulings, correct? Absolutely. Are you familiar with People v. Fallon? C-E-O. C-O-W-E-N? Not off the top of my head. Inconsistencies in child abuse cases are expected, are they not? They are to some extent, yes. But inconsistencies are also the primary way in which to determine whether a child is being truthful or not, because when they invent stories, they don't tend to remember or don't always get the details right where they make them up. Okay. That's all I have. Thank you, Mr. Hill. You'll have some time for rebuttal. Mr. Taylor. Thank you, Your Honors. Can everyone hear me? Yes. Go ahead. Thank you, Your Honors. May it please the Court. My name is Ivan O. Taylor, Jr., arguing on behalf of the people of Illinois. The defendant was probably convicted of predatory criminal sexual assault of a child and aggravated criminal sexual abuse for the following reasons. The trial court did not abuse its discretion in the four alleged evidentiary issues. When it barred Dr. Kevian from testifying as an expert witness, when it barred Melinda Frisby from testifying, when it allowed the victim to testify, finding her to be a competent witness, and when it allowed the victim's client to testify. Second, the defendant forfeited his prosecutorial misconduct claims when he failed to argue plain error review in both his opening and reply briefs. And even if that claim was not forfeited, the actions of the prosecutor did not rise to the level of prosecutorial misconduct. And finally, there was sufficient evidence to convict the defendant of both predatory criminal sexual assault of a child and aggravated criminal sexual abuse. As an initial matter, defendant has just tried to relitigate his case to the Sapella Court, which is improper and not allowed. As this court pointed out during your questioning, essentially, especially with Dr. Kevian's testimony, and as for whether or not the victim was a competent witness, like whether or not the victim was a competent witness, it was not properly presented. His arguments were conflated, and essentially, for Dr. Kevian's case to interject itself into the problems of the jury, which is for the jury to determine the credibility of a testifying witness. The court was correct to find Dr. Kevian unqualified to be an expert witness. The purpose of an expert witness is to assist or try or fact what matters beyond understanding an average person, but the average person can understand and has the capability to determine whether or not a person testifying is able, is going to be able to testify.  allowed to make any discrepancies between current testimony and prior testimony. Dr. Kevian was only there to make an opinion on the credibility, which, as court noted under Becker, is not allowed. As for Ms. Frisbee testifying, her testimony was to whether or not she overheard the victim's mother making a statement that the mother believed that the defendant was guilty of the crimes he was accused of and found convicted of. Unfortunately for Ms. Frisbee, she did not know who made the statement and still did not know at the time of trial, so the court was correct for barring that testimony. And as for whether or not the victim was a competent witness, as noted by the record, the court had a hearing and determined that the victim was competent to testify. And as the defendant admitted, he never questioned at the time whether the hearsay testimony should not have been allowed in. It's only now during appellate arguments and during his opening brief that he tried to conflate the hearsay testimony and the competency of the victim as to why those should have been excluded, but he didn't do so then. He should not be allowed to do so now. As for his grand and prostitutorial misconduct, the defendant never argued in his opening brief that the court was incorrect for not granting mistrial, so any issues regarding the mistrial are forfeited. And as for the other claims, they were never objected to. The claims that the prosecutor made in proper statements during closed argument were never objected to, so they're not properly preserved, and no plain error was ever argued. The defendant did state plain error review but never actually argued plain error and failed to argue plain error for his plain error review. And finally, as to sufficient evidence to find guilt, the defendant only is focusing on the credibility of the victim. He does not question any other aspects of the evidence. And as long as a single witness is deemed to be credible by the finder of fact, a conviction will stand. For this case, for this victim, when she testified, the defendant only pointed out this one instance where she pointed to a picture she drew of the defendant flying in a chair, being reeled in by the defendant's wife, by his wife, with candy. And somehow this makes this victim unable to discern reality from fantasy. This five-year-old little girl made a picture of something that happened between her and her and the person who was supposed to be taking care of her. While not necessarily exact, a jury can understand that the jury and a reasonable person can understand that the picture here is probably some game that was being played and not the girl exhibiting some type of mental disorder. In conclusion, the arguments brought by the defendant were either procedurally defaulted or there is nothing to his discretion in making evidentiary rulings. For the reasons argued in the state's brief, we ask that you affirm defendant's convictions. Thank you, Mr. Taylor. Justice Hutchinson, your questions. Thank you, Justice Burkett. Mr. Taylor, is there anything in the record indicating the appearance of either the defendant or his wife were somehow part of this litigation? Absolutely not, Your Honor. There's nothing in the record that describes the appearance of a defendant or their wife. Any argument as to the appearance of the defendant or his wife has no bearing on this court's determination as it was not part of the record nor was no indication from the record that they were looked down upon by anyone at any point in time. Did the state's attorney mention anything in closing argument to that regard? From my recollection of the record, no. There's no mention in the closed record as to the appearance of the defendant or his wife. Is there anything in this record other than possible argument that indicates that C.W.'s mother had sort of abandoned her because she had other obligations? The record indicates that the defendant and his wife was babysitting C.W. multiple times, but I don't recall the record stating the reason why the victim's mother had to leave her child with the defendant. Okay. With reference to these two pictures that counsel believes are critical to this child's failure to be competent for trial, did C.W. draw these pictures in front of Ms. Mueller or did she bring them in some sort of a book or package to the meeting and showed them to Ms. Mueller? I believe she brought the pictures with her, but I do not know exactly how the pictures were created. But she never said, at least the record does not reflect, does it, that this is what happened the day that he tickled me and I didn't like it. No. There's no indication that the pictures were the pictures of the same day in which the incident occurred. Okay. All right. Justice Burkett, I have no further questions at this time. Thank you, Justice Hutchinson. Justice Shostak. Thank you. One question. The exclusion of Ms. Frisby's statement, I think that's how you pronounce it, is it just a coincidence that she was in the booth and she heard this statement that the mother admitted that she was talking about this? So it's not a mystery as to who it was, is it? Well, at the time, Ms. Frisby could not identify who made the statement at the time. Then also, the statement itself is meant to be character evidence as to whether the mother had a character of truthfulness. She couldn't identify the mother, but the mother admitted in hearing that, in fact, it was her, correct? Yes. I believe the mother later on did admit that she did make the statement. Shouldn't it go to the weight and not the admissibility going for weight? I mean, doesn't it show bias if, in fact, that was a statement? Well, since the mother did admit to the statement, I believe she might have been impeached on that statement that she had made. So the statement did come in for the jury to hear. It did? I believe so. I'm sorry. I might be... I don't think it did. No. As I recall from record, I believe you're right, I'm sorry. So while the mother did admit to making the statement as to whether or not this should come in for weight as opposed to weight of it, the trial court does have discretion to whether or not to allow certain character evidence in. And as for this particular type of character evidence, it can only really be allowed in if it really goes towards the defendant's defense. Again, wouldn't it go into bias to show that the mother, in fact, made this up or had them make this up so that they could get money? Well, that's a possibility, Your Honor. It really isn't. I'm sorry, Your Honor, can you hear me? Yeah, I can hear you. Go ahead. While, Your Honor, this is a possibility... While what you're saying is a possibility, the court did not abuse discretion for not allowing this evidence in. All right. Thank you. I have no further questions. Thank you. Mr. Taylor, with respect to that last topic you just mentioned, it's no abuse of discretion. The defendant developed a theory and argued that Michelle had coached C.W., or that C.W.'s mom had coached her, correct? Yeah, I believe that theory was argued at trial, yes. Is there any evidence that she actually coached C.W.? None. None that I believe was presented to the trial or jury whatsoever. With regard to the argument, which was allegations of prosecutorial misconduct, during the exchange with Michelle on cross-examination, she was asked whether or not Kylie and Timmy were staying with them with the Jacobs the week before the wedding, and she said she didn't write that down. The prosecutor then asked, don't you have this all cataloged, as she had testified before, that she wrote everything down? And then she made the comment, I do it to that time when the prosecutor then said, is that because you're married to the defendant? And the answer was no. That's the context of where that statement came from, correct? I believe so, Your Honor, yes. So, and then it was after that that the prosecutor asked, are you worried about that? And then there was an objection, and the jury was instructed to disregard that question, correct? Yes, Your Honor. So it was the subsequent question, not the first question that was disregarded. The other was in evidence, correct? Yes, Your Honor. That's all I have. Rebuttal, Mr. Heller. Thank you, Your Honor. Just briefly, you had asked about Becker. Becker clearly says that there cannot be on the credibility of witness as opposed to indirect. And there are cases subsequently that talk about indirect, including People v. Katron, K-A-T-R-O-N, a 4th District case out of 2013. Secondly, there was evidence in the record that the mother abandoned this child, and what the reasons were for, there were multiple reasons, but one of them, for example, the three days time that she left the child was because of preparation for the wedding. There was a fairly substantial amount of testimony about the reasons the mother had not spending time with the child. And there was, in my opinion, evidence of coaching. It was the mom that brought the dolls to the little girl and had her show her the parts. It was the mom who took the child to the hospital. And when the doctor asked her if she knew why she was there, her response was, I've been abused. That isn't what a 5-year-old would say. You'd say, Darren touched me, but you wouldn't say, I've been abused. And so I think there was evidence of coaching in the record, and that's really all I have at this point. Any questions on that, Justice Hutchinson? Yes, thank you. You've used the word Mr. Heller abandoned by her mother a couple of times. Did you use that word in front of the jury? No, I didn't, and quite frankly, I used that word. It was part of the question that was asked of opposing counsel. But we did talk in front of the jury about the fact that the mother was leaving the child with others for long periods of time, and basically that was Darren and Michelle. And you're defining three days before this impending wedding as a long period of time? It would have been for me. I know I've gotten divorce cases, but that would be a long period of time for a mother, yes. Okay. Now, I don't have any other questions. Thank you, Justice Burkett. No questions. None. Thank you. Thank you. The case will be taken under advisement. The court thanks both parties for your arguments this morning. A written decision will be issued in due  we have another case on the call. Thank you. Thank you, Your Honors.